Argued September 8; reversed September 29; rehearing denied
December 1, 1936

## SCHMIDT *v.* MULTNOMAH OPERATING COMPANY

(61 P. (2d) 95)

In Banc.

54

*George Black, Jr.,* of Portland (Platt & Platt & Black, of Portland, on the brief), for appellant.

*B. A. Green,* of Portland, and *John H. Carson,* of Salem, for respondent.

ROSSMAN, J. Appellant's (defendant's) only assignment of error challenges the order of the circuit court which overruled its motion for a directed verdict. The defendant operates a hotel in the city of Portland. The plaintiff, one of its employees, was injured September 7, 1932, by the hotel's ice-crushing machine which was being altered under his supervision. His complaint, which is predicated upon the Employers' Liability Act (§§ 49-1701–49-1707, Oregon Code 1930), alleges that the defendant was negligent in the following particulars: (1) in requiring him to work in a place rendered dangerous by an icy floor; (2) in neglecting to install a guard upon the machine; (3) in failing to maintain the machine in a safe condition; (4) in failing to warn the plaintiff of attendant dangers; and (5) in failing to employ every device, care, etc., for his safety. The motion under consideration was predicated upon contentions that the evidence showed the plaintiff was defendant's vice-principal, charged with the duty of maintaining the machine in a safe condition, and that under such circumstances the Employers' Liability Act does not authorize a recovery.

The plaintiff, 49 years of age, who testified that he had had extensive experience with machinery, entered defendant's employ in June, 1930, in an engineering capacity. In August, 1930, he acquired the title of chief engineer and became superintendent of the defendant's engineering department which embraced all of the mechanical equipment of the hotel, including the ice machine which we shall shortly describe. His salary was $250 per month together with room and board. Subordinate to him were several assistants, subject to his direction and control. According to the plaintiff, he could neither hire nor discharge assistants without the approval of the hotel manager, and could not make purchases, with the exception of very minor items in emergencies, without presenting a requisition to the purchasing agent bearing the approval of the hotel manager.

Under the jurisdiction of its catering department, the hotel maintained an ice room equipped with machines for cubing, shaving, and crushing ice. The plaintiff testified that he inspected these three machines shortly after becoming chief engineer, took note of their defects, and, due to their condition, recommended that they be replaced with new installations. The authority was not granted. We are concerned only with the ice-crushing machine. The upper part of this machine was a reception chamber, 12 inches wide, 17 inches long and 10 inches deep. In the lower part of the chamber was a cylinder, 10 inches in diameter and 12 inches long, equipped with picks for crushing ice. The weight of the ice placed in the chamber forced it against the sharp picks of the cylinder which revolved when electrical power was applied. The crushed ice dropped into the lower chamber which was approximately of the same size as the upper. The whole machine was only

2½ feet high, but stood on top of a wooden trough several inches high. The rear and the two sides of the lower compartment were fastened in position permanently, but the front of this compartment (13 inches by 18 inches in size), that is, the part facing the operator, was adjustable. Hinges on its upper edge were fastened to the lower part of the upper compartment, permitting it to be swung open from the bottom. It constituted a door for the lower compartment, and when opened enabled the operator to remove the crushed ice. When closed, it not only prevented the crushed ice, lodged in the lower chamber, from sliding into the trough but also acted as a guard, preventing the operator from inserting his hand through the lower chamber into contact with the picks of the cylinder. The parties refer to this door as a guard or flap. Extending out from the front of the machine was a short trough constructed of planks which held surplus crushed ice. This machine, as well as the other two, when in operation scattered particles of ice about the floor, rendering it wet or icy. Small pieces of ice also fell upon the floor when large cakes were broken preparatory to being cast into the machines.

A few days prior to the accident the hotel manager directed the plaintiff to determine whether the capacity of the ice-crushing machine could be increased. The plaintiff shortly submitted recommendations which contemplated a new cylinder with picks of an improved type and a new or altered guard. By guard we mean the door or flap of the lower compartment. The plaintiff also drew a sketch of the machine in its altered condition and made estimates of the cost of the changes. He submitted these to Earl McInnes, the hotel manager, who, according to the plaintiff's testimony, "Okayed the expenditure and told me to go ahead".

Having gained the needed authority to incur the expenditures, the plaintiff handed his sketch to one of his assistants by the name of Rawlins, and assigned to him the task of altering the machine. The plaintiff described Rawlins as "a good engineer, especially for that kind of work". Rawlins, with occasional help from the plaintiff, dismantled the machine and then reassembled it with the new cylinder. The placement of the guard, however, was omitted. The plaintiff, realizing that when the guard was not in place a hand might come in contact with the cylinder, instructed Rawlins not to operate the machine until the guard was in position. We quote from his testimony: "I had instructed Mr. Rawlins not to run the machine, just made that statement, 'Now, don't run it until I am through.' "

September 7, 1932, four days after the work was begun, Rawlins, according to the plaintiff, "reported that the machine was running and it flashed through my mind that I ought to go in there and look and see if he had put the pickers on the way I had told him to". Upon entering the ice room he found the machine in operation and observed that "they had been crushing a lot of ice, and the ice was piled out on the floor". He swore that it was manifest that Rawlins had not completed the rebuilding of the machine by installing the guard, and admitted that the dangers arising therefrom were evident. He saw the electric switch near at hand by which the power could have been shut off, but, since he desired to inspect the machine in operation, he did not turn off the power. Desiring to observe the revolving cylinder through the lower compartment, he stooped low, almost touching the icy trough with a knee, when one of his feet slipped and his right hand inadvertently entered the lower chamber of the machine where the pickers drew his lower arm into the machine.

He swore that if the guard had been in place this accident would not have happened.

The plaintiff does not contend that he protested when he saw the machine in operation without the guard. Apparently, when Mr. McInnes directed him to increase the capacity of the machine, the latter was placed under his jurisdiction and control. While the plaintiff's testimony sustains an inference that it was the catering department which had placed the machine in operation, he did not inform the catering department that the repairs had not yet been completed, nor report the circumstances to Mr. McInnes. When operation was resumed by the catering department the machine was in complete working condition, even to connecting the belt between the pulley which revolved the cylinder and the main shaft overhead. Nothing remained to be done except to turn the switch which applied the power.

We come now to the plaintiff's account of the absence of the guard. Apparently, he had intended that the upper part of the guard should be fastened to the lower part of the upper chamber with hinges. It is not clear from his testimony whether he had planned to alter the old guard or construct a new one. Whatever may have been his intentions, it is clear that he had ordered the necessary parts, for he himself swore, "I ordered the parts". We quote further from his testimony: "I thought the guard would be finished, but I had not had time to get a hinge, and I am not clear whether we were going to make the hinges or buy them. We were running at such high speed, now my memory is not good and I don't recall exactly". In another part of his testimony he gave the following explanation: "I didn't know it was running, and they were setting it up, and they had the old guard on the bench, and I just forgot to go out and get that material—I couldn't do

it. With all the rush there was, you couldn't think of everything." In another part of his testimony, he declared: "I figured on buying some cheap hinges, new hinges, at the same time. I wanted to get a sheet of metal—I wanted to get a piece of metal to, make a slightly different type of guard than that. The other metal was gone, anyway, the top part of it, and I didn't think it could be used, and I wanted to put some scallops on that metal, on the top of it, in order to make it a little safer on that guard." Later, he added: "I couldn't get everything ready, you can't work that fast, get all the material. I didn't have time to go out and buy—and if they hadn't run the machine and if the catering department hadn't demanded ice, probably they wouldn't have run the machine. And they ran it without my knowing it. That is about it." He was asked: "Had a new guard been constructed or made?" to which he replied: "That I don't know, because—Whether the main part had—I am not clear on that whether I told them to look for a piece of metal, I figured I knew I had to buy new hinges, I wanted that metal so I could bend it in, and there were no scraps in that place." He was then asked: "I want you to tell why that guard had not been installed." And replied: "I didn't have time to do it, didn't have time to get the hinges or material; I intended to look over and see how that was going, and then before I got that far I was so busy that they came in there and announced that the machine was running." He freely admitted that when he saw the machine in operation he could have stopped it by use of the switch which was near at hand.

■ The above statement is based upon the testimony given by the plaintiff. Other witnesses contradicted him, but it is our duty to assume that he told the truth.

It will be observed that, as a witness, the plaintiff claimed the ice-crushing machine should have been replaced with a new one, but, by referring to the above review of the complaint, it will be seen that no such averment is there made. It will also be recalled that the plaintiff claimed that he was hurried and lacked time to complete the overhauling of the machine before the catering department resumed its operation. Again, by referring to the above review of the complaint, it will be seen that nothing is there alleged as a foundation for such a charge. It will be recalled that a mere turn of the electric switch which was near at hand would have stopped operation of the machine. It is fair to assume that a protest to Mr. McInnes would have accomplished a like result. The plaintiff nowhere indicated that Mr. McInnes had taken charge of the machine away from him. Although the plaintiff testified that he was crowded for time during the four-day period while the machine was being rebuilt, he did not testify that he had called Mr. McInnes's attention to this fact nor that he had asked for permission to employ additional assistants. It will be recalled that the plaintiff swore that the floor of the ice room was wet and icy and that his injury occurred when his foot slipped upon the crushed ice. But the plaintiff admitted it was unnecessary for him to ask for authority before cleaning the floor and does not claim that he lacked the necessary instruments for making the floor safe. It will be noticed from the following excerpt taken from his testimony that it was his duty to see to it that any place in which his assistants worked was safe:

"Q. Now, one of your duties as chief engineer down there, Mr. Schmidt, was to see that your assistants were properly taken care of and that their work was such that it was safe for them; that was one of your super-

visory duties, was it not? A. Yes sir, all the men under me I looked at, trying to do everything I could.

"Q. One of your duties down there was to see that they had a safe place to work, isn't that right, Sir? A. Well, if I would see anything wrong, I would tell Mr. McInness about it, that is sure, anything unsafe."

■ In the absence of legislation to the contrary, a foreman or other employee, to whom has been assigned the duty of repairing a machine or rendering an operation safe, has no cause of action against his employer if he is injured through a defective condition resulting from his failure to have performed his duty: *Davis v. Payne,* 108 Or. 72 (216 P. 195); *American Coal Mining Co. v. Lewis,* 77 Ind. App. 394 (133 N. E. 846); *Woelflen v. Lewiston-Clarkston Co.,* 49 Wash. 405 (95 P. 493); *Duffy v. Hobbs, Wall & Co.,* 166 Cal. 210 (135 P. 1093, L. R. A. 1916F, 806); and *City of Teague v. Radford,* (Tex.), 63 S. W. (2d) 376.

The only statutory enactments that are applicable to this section are the provisions of our Employers' Liability Act. The parties have stipulated that its provisions are determinative of the rights of the parties. Section 1 of that act, being § 49-1701, Oregon Code 1930, provides:

"All owners, contractors, subcontractors, corporations or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct, or other structure, or in the erection or operation of any machinery, * * * shall see that * * * all dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits * * * and generally, all owners, contractors, or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protec-

tion and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.''

Section 49-1702 provides:

''The manager, superintendent, foreman or other person in charge or control of the construction or works or operation, or any part thereof, shall be held to be the agent of the employer in all suits for damages for death or injury suffered by an employee.''

Section 49-1703 follows:

''It shall be the duty of owners, contractors, subcontractors, foremen, architects or other persons having charge of the particular work, to see that the requirements of this act are complied with, and for any failure in this respect the person or persons delinquent shall, upon conviction of violating any of the provisions of this act, be fined * * * and this shall not affect or lessen the civil liability of such persons as the case may be.''

In *Marks v. Bauers,* 3 Fed. (2d) 516, (certiorari denied 268 U. S. 704, 45 S. Ct. 639, 69 L. Ed. 1167), the facts were: The plaintiff was the foreman of one of the two shifts which was engaged in the operation of the defendant's rock crusher. A part of the crusher was a power-driven conveyor which carried rocks upward 38 feet to a hopper. He claimed that the defendant should have placed guards upon the conveyor to prevent rocks from dropping down from it upon the employees who were working beneath. He also claimed that the conveyor was so negligently erected that a beam immediately over it occasionally brushed rock off it upon the men beneath. The plaintiff was struck by a rock which had dropped from the conveyor. He admitted familiarity with rock crushers and also that he had helped

to build this one. When asked if he could have made the necessary correction in the conveyor so as to have prevented the falling of rocks, he replied in the affirmative, adding, "if I had had time". The court applied to the above facts the provisions of our Employers' Liability Act above quoted, and affirmed a judgment in favor of the defendant, based upon a directed verdict. It held that the plaintiff owed a statutory duty under our Employers' Liability Act to have remedied the defective condition of which he complained, and that his failure to have done so barred a recovery. Referring to these sections of our law, the decision states:

"As will have been seen, section 6787 of the Oregon laws expressly declares it to be the duty of the 'owners, contractors, subcontractors, foremen, architects, or other persons having charge of the work' in question to see that the Employers' Liability Act is complied with. That duty is by the statute distinctly placed upon each of those specifically mentioned, and all other persons having charge of the particular work, in precisely the same way and to precisely the same extent. Neither the owners nor the superintendent are by the statute made any more responsible for the construction or operation of the particular structure in question than the foreman. The duty so imposed upon each can no more be delegated by the one than by the other."

In *Frese v. C. B. & Q. R. R. Co.,* 263 U. S. 1 (68 L. Ed. 131, 44 S. Ct. 1), the facts were that the plaintiff's intestate, one Frese, was killed in the collision of the defendant's engine, of which he was engineer, with the train of another railroad. The collision occurred in the state of Illinois, and one of the statutes of that state provided:

"All trains running on any railroad in this state, when approaching a crossing with another railroad upon the same level, or when approaching a swing or draw bridge, in use as such, shall be brought to a full

stop before reaching the same, and within eight hundred (800) feet therefrom, and the engineer or other person in charge of the engine attached to the train shall positively ascertain that the way is clear and the train can safely resume its course before proceeding to pass the bridge or crossing.''

Each of the two colliding trains proceeded oblivious of the presence of the other upon the intersecting rail. The plaintiff contended that there was evidence of contributory negligence upon the part of Frese's fireman, and that, therefore, even if Frese was negligent that circumstance would not be a bar to the maintenance of the action under the Employers' Liability Act. In sustaining the judgment of the lower court in favor of the defendant, Mr. Justice Holmes, in announcing the court's decision, declared:

''Moreover, the statute makes it the personal duty of the engineer positively to ascertain that the train can safely resume its course. Whatever may have been the practice, he could not escape this duty, and it would be a perversion of the Employers' Liability Act (April 22, 1908, c. 149, § 3; 35 Stat. 65, 66,) to hold that he could recover for an injury primarily due to his failure to act as required, on the ground that possibly the injury might have been prevented if his subordinate had done more.''

The plaintiff cites several decisions, relying especially upon *Moen v. Aitken,* 127 Or. 246 (271 P. 730), and *Kirby v. Manufacturers' Coal & Coke Co.,* 127 Mo. App. 588 (106 S. W. 1069). In *Moen v. Aitken,* supra, this court, in referring to *Marks v. Bauers,* supra, said that that decision ''is not in point, for the reason that the person in charge or control of the work was a foreman. In the instant case plaintiff was a carpenter in the lowest scale of employment. It was his duty to obey orders and not to give them''. In *Kirby v.*

*Manufacturers' Coal & Coke Co.*, supra, the decedent, for whose death the action was brought, was killed in a coal mine by a blast which he had set off. A statute which regulated the manner in which ways in coal mines could be dug provided that they should be run parallel and that "cross-cuts must be made at intervals not to exceed 50 feet apart". The cross-cuts in the defendant's mine, for which the deceased was not responsible, were not parallel and this circumstance caused the two of them involved in the decision under review to be only seven feet apart at the point where the deceased met his death. At that point one of the defendant's miners under the direction of the pit boss drilled a hole and charged it with explosive. This hole ended within less than two feet from the wall of the next passageway. The deceased, in the discharge of his duties as shot firer, lighted the fuse and then ran into the adjacent way where he was struck by large quantities of coal blown into that chamber by the explosion. Another statute provided: "All shots prepared by the miner for the extraction of coal from off of the solid, must be so placed, drilled and charged, that the same when fired shall perform safely the duty required of such shots." The plaintiff contended that the defendant had violated the statute first quoted and that, therefore, she, as the widow of the deceased, was entitled to maintain the action. The defendant contended that the statute last quoted had been violated and that, hence, the action could not be maintained. The decision, after pointing out that the defendant had violated the statute first quoted, stated:

"When this work was being prosecuted, before and at the time of the death of deceased, it was under the order and direction of the pit boss. Though he knew that shots would be placed in the thin wall to be fired,

yet he directed the work to proceed. This was tantamount to placing the charge in the wall with his own hands, and he thereby came within the terms of the statute as addressed to the miner. * * * In our opinion, that statute does not throw upon the shot firer the entire responsibility for the safety of a charge or shot, as defendant insists. It was not intended to absolve the mine owner from the care and liability imposed upon him by the statute even as against the shot firer himself. These were imposed for the protection of the firer as well as his fellow miners."

It held that the deceased was not bound to assume that his employer had violated the law by bringing the ways too close together, and that the direction of the statute concerning the firing of shots merely exacted of the shot firer the diligence of an ordinarily prudent man. The deceased was not a foreman. Had the pit boss been the plaintiff, a materially different situation would have confronted the court. Without setting forth any further review of this decision, we state our conclusion that it contains little which assists in the construction of our Employers' Liability Act.

■ It will be observed that in our Employers' Liability Act foremen are expressly charged with the duty of seeing to it "that the requirements of this Act are complied with". Its authors evidently believed that its objectives would be better achieved by imposing the duties created by it not only upon owners and contractors but also upon all vice principals. The statute makes no distinction between the duty of the one and of the other. The duties of principal and of vice principal are equal. The plaintiff, as the defendant's vice principal, owed a statutory duty to see to it that the acts of negligence charged in the complaint did not occur. For a violation of his statutory duty he was subject to a penalty which, as the act states, "shall

not affect or lessen the civil liability of such persons'',
referring, among others, to vice principals.

■ It seems evident that one who has violated a sta-
tutory duty can not have a statutory right of action to
secure redress. We believe that the Federal Circuit
Court of Appeals, in *Marks v. Bauers,* supra, correctly
construed our Employers' Liability Act.

■ It follows from the above that if the ice crushing
machine could not have been safely operated or in-
spected without the guard described in the complaint
it was the plaintiff's duty to have installed it before
proceeding with his operations. He was under no duty
to proceed until the machine had been made safe. A
switch was near at hand by which the machine could
have been stopped. It is our belief that the statute upon
which the plaintiff relies does not create a liability in
his favor.

Such being our opinion, the circuit court erred when
it denied the defendant's motion for a directed verdict.
The judgment of that court is reversed.

KELLY and RAND, JJ., concur.

BEAN and BELT, JJ., dissent.

CAMPBELL, C. J., and BAILEY, J., not sitting.